Thanks for joining us. Let me introduce the report. My name is Mark Caldwell. I'm appearing today on behalf of Ms. Popa on the Social Security Disability case that I'll keep track of my own time, which I know is not good for him. And, um, um, we'll try to reserve two minutes more. Okay. There are two, um, just positive issues in this case. The one, actually two substantive issues, on the one, um, the opinion of the treating, um, doctor, nurse practitioner, um, Sorrell, and then, of course, the agency's own examining doctor, psychologist, Dr. Hartman. As a preliminary matter, although I don't think it's that important, my position is that the current convincing standard for, um, looking at uncontradicted medical opinion evidence should apply in this case because the agency did not rely on any substantial evidence that contradicts the medical opinions. That said, I think the lesser standard and the specific and the general reasons for contradicted medical opinion evidence, um, I believe, is hope issues still prevail. So, as I said, we have these two doctors. Um, Dr. Sorrell, who is the treating medical source, and Dr. Hartman, who is the agency's, um, examining psychologist. So, Dr. Sorrell is accepted should result in a finding that, um, Ms. Popa cannot perform any work because the vocational expert said that the limitations that Dr. Sorrell, um, gave would prevent the ability to perform any sedentary work. And then the examining psychologist, Dr. Hartman, did not receive that vocational expert testimony that is actually inconsistent with the ability to perform any work. He said, um, that Ms. Popa was, to quote, not likely to sustain regular attendance. So, obviously, the commissioner has a duty to assist clients work capacities based on the ability to sustain those capacities on a regular and continuing basis. And not being able to sustain regular attendance is facially balanced with that duty. So, this case can be disposed of on either of those medical opinion evidence. So, let's talk about Dr. Sorrell Um, because the vocational expert said that her assessed limitations would preclude any sustained work. So, what did the ALJ do with Dr. Sorrell? The ALJ said that the evidence showed that she gave her opinion by way of a chipped mark before. And that is true, but it is a new plain characterization. Dr. Sorrell gave clients and supported before. Have you noticed this this reasoning across I'm sorry, you're interfering. I'm on the music line, so I'll try to do that. Have you noticed that across these social security cases, this well, they gave their opinion in the form of a checked box listing is a common basis for discounting testimony? It's a common offered basis. I don't think it's a common legitimate basis. I understand what you're saying, what you're arguing, but as you see, I'm seeing it in a lot of the basis for discounting. And I'm wondering where it comes from because as long as I've seen these cases there's always been I mean, I don't know who creates these forms. Um, and what they've always been admitted at least until recently, all of a sudden, they're discounted. Well, I hope that they're all of a sudden disincorporated. I mean, the New York City Jews in 2014 said that it was supported by the doctor in underlying records. These Sorrell Jews also in 2014 No, I think the ALJ seem to find that, or I've seen two clientees on that as a reason when I don't quite understand where that came from. Um, I can only give you an interesting figure that it came from. I can tell you as a practical matter that attorneys representing clients can't ask too much more of treating doctors. These are too much medical school to practice medicine enough to fill out forms for social security attorneys. Um, and you know, sometimes we're actually fortunate that we can even get some comments in support of those assessment decisions. It's frankly, as a practical matter, too much to ask of these treating medical sources. There's a very long narrative report that just doesn't handle that set. You look at the treating news, the treating progress news, and you see the support there. And I think that's the case in Dr. Sorrell's situation. Dr. Sorrell, by my count, treated Ms. Popa eight times for a period from May of 2011 to December 2012. So she had quite a bit of treating experience under the circumstances that these doctors have been working. So to answer your question, yes, you see a lot of general art forms. Yes, you see DOJs using that odd, boilerplate language to reject treating medical source opinions. Is that legitimate? No. And I say empirically, our own cases have supported that. So let's get rid of that as a legitimate reason. I'll go on to the other reason the DOJ gave. The DOJ said that there was either contrary evidence or isn't. The only evidence is a state agency physician who never laid eyes on Ms. Sorrell who said there were no mental impairments. But the judge said there were at least some. So by giving a contrary opinion, the DOJ rejected even the state agency doctor. Then the DOJ said, well, there's contrary evidence. But she didn't tell us what it was. So she didn't tell us what it was. I can argue that in court. Thank you for your question. We would also say that just for a problem we so often see in these cases where the DOJ frankly is acting as a doctor, the DOJ is saying, well, look, the evidence, and I think it's contrary, but the DOJ doesn't tell us what that is. The DOJ also, and frankly, again, this is boilerplate language. Well, here the DOJ said that these findings, and then she went, here she went on to say she attends church, she shops for groceries. I guess those were the two things that were inconsistent. Are they? Are they? I'll ask you. It was a referral to SG. Are they inconsistent with the ability to sustain work on a regular and continual basis? I think the other one was Washington Television. So these clearly do not, are not examples of the ability to perform sustained work activities and that's the case. So my answer to your question is no. They are not consistent. Are you consistent with Dr. Sorrell's assessments? Do you want to keep track of my time? I'm really curious to hear from you. Of course. Thank you. May it please the court. I'm Michael Tunick. I'm here to represent the Acting Commissioner of Social Security. This book, this case, focuses on the evidence that is favorable to repeal to the exclusion of the evidence that is unfavorable to repeal. She talks about the particular medical opinion that could dispose of this appeal but this medical opinion she discusses actually conflicts with itself as well as the opinions of the agency doctors. Also she disputes the fact that the ALJ, opposing hypotheticals, the vocational expert, did not include evidence favorable to Ms. Popa. The ALJ did include evidence favorable to Ms. Popa, for example. But it didn't include the 10% vocational recognized by Dr. Sorrell. That was part of the evidence they don't have yet. The reason that that was included is because the ALJ does not have to include residual functional capacity assessments. As I said, it's properly discounted. The ALJ discounted Ms. Popa. So he didn't include the hypothetical you're talking about? He didn't have to because it was probably discounted. That's correct. He did not have the hypothetical relied upon. Do you find that MSM-5 should be performed to three other typical lay-ups in the records? Of course ALJ doesn't claim that Dr. Sorrell's opinion may have been the result of sympathy. The evidence that the ALJ was relied on really was just the fact that it was in such stark contrast to the other evidence in the record, the other opinions in the record. It really was not supported by the treatment notices for that reason the ALJ inferred. It could be the result of sympathy or an effort to avoid unnecessary confrontation with the patient. How do you respond to Ms. Esselstyn about the treatment notes over that 13-month period? Did he claim support that this was not true? Dr. Sorrell's treatment notice for the time is May 11, 2011, December 2012. Do you disagree with that claim? I disagree that the treatment notice support the opinion. I know that that is argued in the briefs. I point out that it actually is the treatment notice document that bears some motor restlessness, but that is a far cry from what is assessed in the form as far as the ALS test has presented. What is motor restlessness? Probably what I'm experiencing right now. Is that true? So you're referring to your job? I look down to the checks that you recorded and the fact that I have no interest in the other parts of the nurse practitioner's opinion. First of all, I want to say that although the nurse practitioner, Sorrell, has a huge key in nursing, it is not such. Under the regulations, she is not considered an acceptable medical source, and so the reviewer came under the germane standard. ALS should be provided for such germane reasons. You talked about the inconsistencies with her activities, the reasons that the activities are inconsistent with the opinion, for example, the social limitations that nurse practitioners are assessed are in contrast to the ability to socialize with people, with other people, maintain friendships, have significant others, as well as just socialize in church. And as far as the medical opinion evidence, but in the record in the case of Ms. Brock, I saw her going to church a couple years earlier. The nurse's story and the hearings with ALS shared was that, yeah, I have not gone for a while, and as far as the reason that she had not gone, there's no evidence. As far as I can tell, her condition deteriorated, and that would have caused her to be unable to go to church at some point, and so I don't know specifically why. Is it too busy with other activities? That's possible. I have known that she was also on probation for a period of time and wasn't able to leave the house, so that could have been an explanation. So when we conducted Hart's testimony, that she was unlikely to attend work, and it's a fairly significant statement. It is, in fact, a very significant statement. I recognize that, and you would agree that it is credited, which the ALJ did not. I don't understand why the ALJ accepted every statement that the examining physician made except for that one. Well, first of all, let's look at what the statements were. They were really just minimal limitations, including that this individual performed well during the examination, 28 out of 30 on the mini-examination, and still good social record, reciprocity, good daily activities, and then in the same, you know, everything was minimal, just no limitation, except that he had to indicate that he was actually not able to attend regular attendance. The ALJ talked about how the business inconsistent with her daily activities, and that was the reason. So she's watching television, you said? Yeah. Do we know if she's paying attention to every show or if she's all out every 10%? Well, the ALJ's 10% of the time was the nurse practitioners, and those who were talking about Dr. Hart, Dr. Hart did talk about maintaining regular attendance. And as soon as Dr. Hart maintained regular attendance, the activities that she engaged in, all that Dr. Hart listed were examples, by way of example, she goes to church. Did he take all those from her testimony? Oh, all of those came from her testimony, right? There's testimony there where I'm going to contradict a lot of that, but she said, these are the things he sees she does. She answered, sometimes, and so she said, sometimes if I'm hungry and there's nobody else cooking, I'll cook. Do you wash dishes sometimes? Do you mop or sweep? No. My mom has a clean laundry. Do you do your own laundry? No. Do you do grocery shopping? Sometimes. And you can read all of this about what she does, how she really just watches TV all day. She gets to about 11 and then spends three hours watching TV with her mother until they're at home. I guess what I'm finding is if the ALJ is relying so much on her testimony for all of these things where it reaches the conclusion that the treating physician does funny, is it consistent with her report of her daily activities? If it's not the case, then rather contradicts that. If I may clarify your question, you're talking about a treating physician, so Dr. Hart is an examining physician, so are we still talking about Dr. Hart here? Or are we talking about the nurse practitioner? Who is the treating physician? The examining physician. There are various statements that Ms. Wilke made throughout the record, and so I agree with you that there was qualifications to choose the performance of some of these activities, but the fact is that she didn't perform these activities. Some of the limitations were some of them she used a vacuum, and the reason she's vacuuming now is because there's someone else who does it. Is there any question that she is on all of these medications, including all these psychological medications, and she says they make me sleep too much sometimes, they make it hard for me to get up in the morning, and sometimes I don't get up. I recall, if I take this machine, there's no doubt she's on all this medication, right? That is true. She's on that medication, and this is as far as, you know, there are some inconsistencies in the record, so every time she's the first question, just to be real, she was asked, do you have any side effects from the medication? She said, no side effects. Additionally, when she went to the sealed office to talk to a sealed office employee, she did not list any side effects from the medication, so although her testimony at one point does talk about side effects at the hearing, there's a couple years of her reporting no side effects, and so that's the reason I don't think that that testimony can be credited as there's a conflict within her own report. Thank you. I see that I have about a minute left. If there's no questions, I'll just say my concluding remarks. So, as I said, the evidence, the record, there's conflicting evidence. Ms. Lobos focuses on the conflicting evidence the ALJ considered. Ms. Lobos focuses on the evidence favorable to her, the ALJ considered both the favorable and the unfavorable with evidence, and came to reasonable reasons to discount some of the favorable evidence and also discount some of the unfavorable evidence, and so as a result, we have the pendulum that's challenging the one part of Dr. Orr's opinion, the rest of Dr. Orr's opinion, actually supports the ROC and contradicts with her district's opinion, and the ALJ provided true reasons to discount that and so the decision was supported by substantial evidence, and Ms. Friedenbarg fully declared and therefore passed the court. Thank you very much. Thank you. Thank you. Thank you. Thank you. Thank you. The matter that I would like to emphasize is that Dr. Sorrell and Dr. Hart have both given the teachings that would preclude work, and this court should remand for more evidence. There is no reason to put Ms. Lobos through the decline period of further administrative procedures. How do you satisfy the criteria to that the ALJ would find a claimant disabled to remand? No, he has already remanded, and now the ALJ goes through the process of asking the plaintiff to go with all limitations that the doctor has identified. Judge Hughes said to the ALJ in answering this question that ALJ didn't need to. Ms. Lobos, I'm sorry, asked the question. It says overkill and the effect of these limitations as specifically defined. And the VAE said it without any contestation whatsoever that those limitations would preclude work. And as one of the members of this panel said, even Dr. Lobos' limitations are facially inconsistent with the ability of him to perform sustained work. There's nothing left to do. All the evidence shows that Ms. Loba is disabled, and I'm not sure you're offered any persuasive reasons why Ms. Loba shouldn't undergo further administrative procedures. I have one inquiry question for you, and it is so Dr. Sorrell was the treating nurse, and she's the nurse practitioner, which we are seeing more and more now, nurse practitioners or actual doctors treating. And I'm just wondering, is it a regulation that says just money isn't worth as much as the treating physician, or what is it about the structure of this thing? Yes, that's a question. There's a specific regulation, 20 CFR 404.1513, which talks about various sources, and it says  medical sources are UDs, DLs, certified psychologists. The reason I say that's a tough question is a certified psychologist who has a Ph.D., and Dr. Sorrell who has a Ph.D., she didn't have the label of psychologist. So the practitioner wants the court to focus on the nurse practitioner part. Obviously I would like the court to focus on the Ph.D. part. Having said that, I will admit that a nurse practitioner, even if the nurse practitioner has a Ph.D., does not fall under the strict definition of an acceptable medical source. I also want to say that the whole language of that regulation is unfortunate. The word acceptable implies that other sources are not acceptable. And that's not true. The regulation merely says that other sources can't establish the definition, excuse me, the diagnosis of an underlying medical impairment, but they're undoubtedly qualified to assess the severity of the symptoms from the medical impairments. And that's exactly what Dr. Sorrell did here. So my response to your question, which I'm working on, is that by analogy, I believe that Dr. Sorrell is an acceptable medical source, but it doesn't make any difference. The ALJ already recognized the underlying medical impairment. So even if Dr. Sorrell is considered a nurse practitioner, another source, Dr. Sorrell still gave limitations that resulted in uncontested vocational expert testimony, even if he's not an expert. And then, as folk would argue, it was a state work. And there's no contradictory evidence. And on top of that, we had Dr. Carter, who submitted no to medical sources, and it gave up limitations and consistency to state work. And the practitioner has a right to anything that contradicts that, other than he reviewing state agency doctors in their early lives on his own people. And even then, the ALJ gave a contradictory assessment, effectively speaking, rejecting that model for examining doctors' opinion. So the universal substantial evidence of medical opinion in this case established the disability, and that's why it's no wonder that this court remanded for calculation that it's not further administrative proceedings. So what do we do with our case law with the Molvina and Gomez? Gomez is a nurse practitioner case. Molvina is a physician's assistant case. How would you distinguish those? There's another case, the Dale case, that talks about the ALJ improperly rejecting the nurse practitioner's opinion. But the cases you have cited, I do not dispute that they say a plain old nurse practitioner, not a Ph.D., is an other source. But this dovetails with my answer to Dr. Erdogan's case, that even if it's an other source, the other source is completely qualified under the regulation that I cited previously to provide an assessment of the symptoms, if you have the diagnosis, because you already recognize the diagnosis. So there is no impediment to looking at the nurse practitioner's assessment of what's focused on the key issues, and that's why the screening records that I will keep during the court law meeting over a year and a half show that she's adequately qualified to assess the limitations that this group of sufferers and therefore her status as a nurse practitioner or as we call an acceptable medical source here is irrelevant, because even the agency's own regulation says that those individuals are qualified to provide an assessment of the severity of the illness. So even if you consider Dr. Sorrell a other than an acceptable medical source, you still have the contradicted evidence of the symptoms that result from the clinical improvements. Now let's throw Dr. Hart as well, because he isn't an acceptable medical source. Thank you, counsel. Thank you, sir. The notifications of the party will be submitted for decision. We will proceed to the hearing.
judges: Thomas, Wardlaw, Morris